IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 17-cr-00197-WJM

UNITED STATES OF AMERICA,

  Plaintiff,

v.

CHRISTOPHER PAUL KELLY,

  Defendant.

---

**MOTION FOR STATUTORY SENTENCE AND SENTENCING STATEMENT**

---

  Defendant Christopher Paul Kelly, by and through his attorney Mary V. Butterton, respectfully moves this Court for a sentence below the range recommended by the United States Sentencing Guidelines. Mr. Kelly is requesting a sentence of five years' probation, to include a term of home detention of 6 months and a requirement of 500 hours of community service. In support of this request, Mr. Kelly submits this sentencing statement.

**I. Introduction**

  Every human story is complex, and Mr. Kelly's is no different. As is true with almost anyone facing federal criminal charges, the path that brought him before this Court is multilayered and multifaceted; it involves great loss to Mr. Kelly and also a series of poor decisions to push off his tax obligations as long as possible. 18 U.S.C. §3553(a)(1) requires this Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." In the instant matter, the two are intrinsically intertwined; this tale of tax evasion is incomplete without the context of the personal circumstances that led Mr. Kelly to

evade. These circumstances are not excuses, but instead their telling will hopefully aid the Court in understanding Mr. Kelly's course of conduct and aid it in crafting an appropriate sentence.

Ultimately, both Mr. Kelly's history and the statutory factors point toward a non-incarceration sentence. While this Court is acutely aware of the public harm of white collar crime, this crime is inherently different. Mr. Kelly is not requesting a "middle class sentencing discount,"[1] for his actions. Rather, he is asking the court to examine the circumstances of his evasion, the inherent difference between tax evasion and other white collar crimes, as well as the flaws in the tax guidelines under U.S.S.G. §2T.

Tax evasion is <u>not</u> stealing the hard-earned or hard-saved money of others; rather, it is criminally depriving the government (and yes, in turn those who benefit from government services) their due cut of one's earnings. It is true that Mr. Kelly avoided and delayed his back taxes for years - criminally, of course - doing so after his legitimate business, one that had eight employees he supported, was defrauded and liquidated. But it is also true that he did not steal this money; rather, he evaded and delayed paying taxes on income he earned lawfully. Since 2008, he has clawed his way back from financial ruin, and is now in a position to have his tax liability paid off in relatively short order. These circumstances, combined with the flawed construction of applicable Sentencing Guidelines, show that a sentence well below the Guideline range is appropriate.

**II.     Mr. Kelly's History and Characteristics, and his Tax Evasion**

In 2008, Christopher Kelly had finally made it. The son of a school administrator and public school teacher, Chris had been a poor student in high school and didn't attend college, but

---

[1] *United States v. Stefonek,* 179 F.3d 1030 at 1038 (7th Circuit 1999).

had worked his entire life. In his twenties, he worked in sales and restaurant jobs; in the 1990s, he was a salesman for Yellow Pages, and in 2002, he began working in the credit card processing industry. By 2008, through his business as a credit card processor, Chris had multiple employees, owned real estate and a nice car, and was making a strong income- so strong, in fact, that he would have easily been able to pay his 2006 tax liability of nearly $190,000. Then the bottom dropped out - both with his business and a national recession.

In the spring of 2008, Chris' business was defrauded out of nearly $4,000,000.[2] A vendor client named Jason Taylor, whose transactions Chris' company processed, began charging its customers for merchandise it didn't deliver.[3] As the customers complained, their banks began refunding money, and Chris' company, as the middleman between the bank and the vendor, was on the hook for penalty fees for these "chargebacks."[4]

Chris' business and personal life went into a downward spiral. He lost both houses to foreclosure (and, due to the national recession, could not pull equity out of the properties or sell them) and his personal credit was ruined. During this time, he did not pay his 2006 tax liability. He used any money he could get his hands on to pay his employees and to keep his business afloat. In late 2009, he cashed out his Mutual Life insurance policy for $18,670.92 - an asset the IRS could have levied; by 2010 his company was completely liquidated. In June 2010, he cashed

---

[2] In Doc. 34, the Government claims to have been unable to verify this fraud. This issue will hopefully be put to rest by letters from Mr. Kelly's former employees, who witnessed the fraud, as well as the criminal charges of the man who perpetrated this fraud, of the exact same scheme in the state of Utah.

[3] Mr. Taylor was later charged for a similar scheme out of the District of Utah, in federal criminal case number 14-CR-00137-DS.

[4] See 2:14-CR-00137-DM, at Doc. 111 (Government's Sentencing Statement). There, the Government noted that "credit card companies impose penalties on banks whose merchants exceed a chargeback rate of 1%, and instances of merchants running afoul of these limits are exceedingly rare." Doc. 111 at 10.

out his 401(k) for $34,060.81, money that should have gone to his substantial tax liability, and instead he used it to live on. Also in 2010, Mr. Kelly's wife Meghan discovered she was pregnant, and gave birth to his son, Reece.

The years 2010 through 2012 were a struggle for Chris. In 2013, he managed to finish paying off his 2005 back tax (filed in 2008) balance of $205,000. His bank account was levied by the IRS, so he and Meghan paid all of their bills through her bank account or his business account. In 2012, he filed his 2007 tax return - for income he had at the height of his success - and owed over $285,000 plus penalties. Chris kept pushing the IRS off, misleading them about his ownership interest in his business (despite the fact that business was making very little profit), as he didn't have anywhere close to that kind of money to pay.  He continued to pay taxes on his income, and dedicated his resources to two things: rebuilding his business, to try to capture his former success, and providing living expenses for his family.

The Government has and will likely continue to emphasize that Mr. Kelly lived beyond his means. Without question, Mr. Kelly could have allocated his resources differently, but he had abysmal credit - mostly because of his enormous state and federal tax liens. Unable to secure a traditional lease, he relied on friends and friends of friends to rent to his family. These friends were often people of means who offered second homes for his family to rent, and Mr. Kelly paid higher lease prices to mitigate their risk of renting to a family with bad credit. Similarly, while Mr. Kelly once had the means to drive expensive cars, since losing his business he has relied on leases procured by friends and family since he did not have the credit to lease, much less purchase, a car on his own.

Mr. Kelly's housing and car choices don't reflect a significant deflection of assets. He was not going on extravagant vacations or purchasing properties - he put his money into his family expenses, to paying off prior tax debt, and into his business. This drive to succeed reflects a man who was desperate to regain his former success. Now, in 2018, as an employee at a credit card company (with far stricter industry regulations than those in 2008), Mr. Kelly has finally regained the financial success of 10 years ago. Today, his significant income is garnished by the State of Colorado for tax debt at a rate of just under $2000 a month; he has paid this faithfully for two years and that debt will be fully repaid in a matter of months. Mr. Kelly's income, particularly after this debt is discharged, will allow him to pay his nearly $1 million dollar tax debt in relatively short order.

Today, Mr. Kelly resides with his wife Meghan and his now 8-year-old son. Meghan has some significant health issues and was recently laid off; Mr. Kelly is the sole support for his family. Mr. Kelly has no significant criminal history.[5] This felony conviction will affect Mr. Kelly in a litany of ways, most notably in securing employment if a term of incarceration is imposed. Should a term of incarceration not be imposed, Mr. Kelly will be able to continue in his current job and make significant payments toward ordered restitution.

### III.     Tax Evasion, Penalties, and the Guidelines

Mr. Kelly's tax debt is $550,489.72, and is nearly doubled by interest and penalties, to $929,098.39. Doc. 33 at ¶ 22. The crime of tax evasion is in some ways unique; the amount used to calculate the appropriate penalty under the U.S. Sentencing Guidelines *already includes* a

---

[5] Mr. Kelly's one criminal history point is derived from a misdemeanor DUI conviction from 2002. PSIR ¶ 40.

penalty.  Mr. Kelly's is a penalty of $116,411.50, over 20% percent of his tax debt. Under U.S.S.G. §2T1.1, Mr. Kelly's loss calculation includes penalties and interest, putting him at a base offense level of 20.[6] With his criminal history category of I, and his reduction for acceptance of responsibility, the guidelines advise a range of 24 to 30 months imprisonment.

At times, the Guidelines may represent a fair aggregation of the 3553(a) factors; in tax evasion cases, as the Commission has recognized, the guidelines overstate the need for incapacitation and specific deterrence when an offender has limited prior criminal history. Mr. Kelly has not been convicted of a crime of violence or similar serious offense, and presents a very low risk of recidivism.[7] Mr. Kelly is exactly the type of offender Congress was envisioning when instructing the Commission to create guidelines that reflect the general appropriateness of imposing sentences other than imprisonment in cases where the defendant is a first time, non-violent offender. Unfortunately, the Commission did not heed Congress's directive and, instead, created a Guidelines regime that never recommends probation.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C.

---

[6] Notably, without interest and penalty, Mr. Kelly is less than $500 from the lower base offense level; without inclusion of the "relevant conduct" of his 2013 taxes, he would be well below that margin.
[7] 80% of offenders in criminal history I do not suffer another criminal conviction, according to a 2017 study by the U.S. Sentencing Commission. https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf (last accessed 6/26/2018).

§ 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners quickly abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead, purportedly based the guidelines on empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1, Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. Id. at 348-50.

The Court has recognized, however, that not all guidelines were developed in this manner. See *Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of `empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence `greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." Id. at 109-10.

7

Here, the applicable Guidelines [ §§ 2T1.1 & 2T4.1] are not the product of the Sentencing Commission employing an empirical study, as its designated mission, to establish past sentencing practices for convictions of this crime. Because the Commission failed to rely on empirical data or national experience in promulgating or amending §§ 2T1.1 & 2T41, and thus failed its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S.Ct. 840, 843 (2009).

For starters, the Commission blatantly disregarded empirical data of past practice and pre-guidelines sentences in tax fraud cases when it promulgated § 2T1.1. Under pre-guidelines practice, 50% of tax fraud defendants received a probated sentence; the remainder served average sentences of 12 months. This is a drastic difference from the promulgated tax guidelines where *every single defendant* receives a recommendation of imprisonment, and most recommendations are far removed from the pre-guidelines average of one year. In the "background" section following § 2T1.1's application notes, the Commission readily admits to this deviation:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length. As a result, the number of purely probationary sentences will be reduced. The Commission believes that any additional costs of imprisonment that may be incurred as a result of the increase in the average term of imprisonment for tax offenses are inconsequential in relation to the potential increase in revenue. According to estimates current at the time this guideline was originally developed (1987), income taxes are underpaid by approximately $90 billion annually. Guideline sentences should result in small increases in the average length of imprisonment for most tax cases that involve less than $100,000 in tax loss. The increase is expected to be somewhat larger for cases involving more taxes.

*See* USSG § 2T1.1, background commentary.

The Commission has further disregarded its designated mission by failing to monitor the national experience since the promulgation of the Guidelines and amend them accordingly. Despite the Commission's blatant disregard of past practice, sentencing courts post-*Booker* seem to be drifting back towards the pre-guidelines sentencing practices where a majority of tax fraud defendants received probationary sentences or, in the alternative, much lower sentences than what the Guidelines currently recommend. For example, in 2017, tax crimes nationally were sentenced below the guidelines 73.5% of the time (48.8% without government sponsorship).[8] In the District of Colorado, within the last 10 years, 58.3% of tax evasion offenders were sentenced below the guideline range.[9]

This trend could, in large part, be based on the realization that the tax guidelines in general, but specifically the loss charts that drive the tax guidelines, were not the product of the Sentencing Commission employing an empirical study, but instead, "[t]he history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as the amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *United States v. Coursey*, 723 F.3d 366 (2nd Cir. 2013)(Underhill, J., concurring).

## IV.    A Sufficient Sentence

Section 3553(a) requires that this Court impose a sentence that is sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law,

---

[8] United States Sentencing Commission, Quick Facts: Tax Fraud Offenses, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Tax_Fraud_FY17.pdf last accessed 6/25/2018.
[9] This information was gleaned from a search of PACER by counsel.

provide just punishment, afford adequate deterrence, to protect the public from further crimes, and to afford the defendant with needed training, medical care, or treatment. As detailed below, a sentence of probation, with home confinement and a significant term of community service, would meet those objectives in this case.

      A.    *The Need for Just Punishment in Light of the Seriousness of the Offense*

Mr. Kelly agrees he should be punished in this matter. The Guidelines treat the amount of the tax loss as the sole indicium of seriousness, but the true need for retribution "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005).

Here, the victim of Mr. Kelly's evasion is the Internal Revenue Service (IRS). Mr. Kelly deprived the IRS from their rightfully due tax, but it is important to note that the IRS does not have the vulnerabilities of an individual victim, or a retirement fund, or investors. The IRS has regulatory and statutory tools to not only recover debt, but collect it with interest and penalties that increase as time passes. In this sense, the seriousness of the harm created by this crime is much less than by those who perpetrate traditional fraud against individual victims.

Further, Mr. Kelly was not evading his tax to live a lavish life. In *United States v. Yurek* (15-CR-00394-WJM), the married co-defendants evaded taxes and instead used their income on an extravagant lifestyle, including multiple vacation homes and an expensive country club

10

membership.[10] [11] Here, not so. While Mr. Kelly rents a home at a high rate (which he is renegotiating currently), he did not (and does not) live an exorbitant lifestyle. He owns no property, he has no credit cards, and he has no savings. The type of blatant greed present in other cases simply is not present here.  Rather, Chris Kelly is a man who continued to procrastinate his tax liability until he could build his business to the point where he could pay it. That behavior is unequivocally criminal, but the circumstances around it have direct bearing on the appropriateness of severe punishment.

      B.    *The Need for Deterrence*

In advocating its sentencing position in tax evasion cases, the Government has often keenly focused on the need for general deterrence.[12] But research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty

---

[10] 15CR00394, Government's Sentencing Statement, Doc. 259

[11] Notably, both Mr. and Ms. Yurek went to trial and upon conviction received sentences well-below the advisory guideline range (as calculated in the Government's Sentencing Statement, Doc. 259). Of course, counsel does not have access to their respective Presentence Investigation Reports and thus cannot comment as to the statutory factors applied in those cases.

[12] *See* 14-CR-00137-CMA, *United States v. Annis,* at Doc. 39 (Government's Sentencing Statement) ("Given that the tax system depends on citizens complying with tax laws, defendant Annis's willful and obstinate refusal to comply with his tax obligations for a decade requires a term of imprisonment in order to accomplish the objectives of 18 U.S.C. § 3553(a), especially the objectives of both specific and general deterrence."); *see also* 15CR00394, *United States v. Yurek,* at Doc. 259 (Government's Sentencing Statement) ("[G]eneral deterrence is one of the most important sentencing factors in this case…")

11

of punishment is empirically known to be a far better deterrent than its severity."). Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

Here, the goal of general deterrence can be met in ways outside of incarceration. First, his extensive financial penalties are the mostly likely factor to deter those in Mr. Kelly's position - the example of penalty and interest that double his tax liability speaks volumes to those who are most motivated by greed. Further, the request of 500 hours of community service will provide a public display of Mr. Kelly mitigating his harm to the community. A reasonably short deadline for this service will require Mr. Kelly to dedicate large amounts of time to improving his locality and demonstrate that those who deprive society from the benefits of tax will have to repay their communities not only financially, but with their time and sweat equity.

C. *White-Collar Cases Generally, and Mr. Kelly*

This Court is well-versed on common sentencing arguments for white collar defendants - most usually, the increased collateral consequences for a middle or upper-class person. This argument has been soundly rejected by some Courts, most notably the 6th Circuit in *United States*

*v. Musgraves*, 761 F.3d 602 at 604 ("A diminished sentence based on these considerations does not reflect the seriousness of his offense or effect a just punishment."). Mr. Kelly does not assert that his collateral consequences are any different than those facing a different crime of conviction. Those consequences certainly exist - a strain on his family, difficulty in future employment, etc. - but they carry the same weight as any other defendant who stands before this Court for sentencing. Similarly, Mr. Kelly agrees that those who have the ability to make a living outside of criminal activity should be held "more….culpable than their desperate poor and deprived brethren in crime." *United States v. Stefonek*, 179 F.3d 1030 at 1039 (7th Circuit, 1999). Mr. Kelly did have means, albeit not due to inherited wealth or even an extensive education. He is an entrepreneur, whose taxable income was based on money he earned through hard work, not through fraud or deceit or the luck of being born wealthy; when he lost it all he lied and evaded to pay his due taxes. Mr. Kelly is not asking for disparate treatment. Rather, he asks that this court consider his low risk of recidivism, his lack of danger to the public, the nature of evasion as different than other types of fraud, the flaws in the construction of the tax guidelines under U.S.S.G. §2T, as well as the full circumstances surrounding his evasion.

**V.      Conclusion**

Chris Kelly has admitted his guilt, and submits that his actions warrant punishment. A sentence of five years of probation, combined with 180 days of home confinement and 500 hours of community service meet the statutory sentencing goals of 18 U.S.C. §3553(a). This sentence is below the advisory guidelines promulgated by the U.S. Sentencing Commission, but is sufficient and fair.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


s/ Mary V. Butterton
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Mary_Butterton@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2018 I electronically filed the foregoing *Motion for Statutory Sentence and Sentencing Statement* with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Pegeen Rhyne, Assistant United States Attorney
Email:  Pegeen.Rhyne@usdoj.gov

Martha Paluch, Assistant United States Attorney
Email:  Martha.paluch@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Christopher Kelly (*via* U.S. mail)

s/ Mary V. Butterton
MARY V. BUTTERTON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Mary_Butterton@fd.org
Attorney for Defendant